UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
AEP ENERGY SERVICES GAS HOLDING
COMPANY, *et al.*,                                   :

                        Plaintiffs,           :          05 Civ. 4248 (TPG)

             - against -                  :          **OPINION**

BANK OF AMERICA, N.A., *et ano.*,          :

                  Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      In this action plaintiffs are AEP Energy Services Gas Holding Company ("AEPGH"), Houston Pipe Line Company LP, and HPL Resources Company LP (together "HPL"). All plaintiffs will usually be referred to in this opinion as "AEP." Defendants are Bank of America, N.A., ("BofA") and The Bank of New York ("BONY"). BONY is trustee of an entity known as Bammel Gas Trust ("BGT"). BGT is a special-purpose entity owned in equal shares by BofA and Enron Finance Corp., a subsidiary of Enron Corp. In one of the two transactions at the heart of this case, BGT borrowed money from BofA to buy gas from HPL, which it then, effectively leased back to HPL.

      AEP's claims arise out of a 2001 transaction wherein AEPGH purchased HPL from Enron. AEP's claims can be divided into two sets, (1) declaratory claims, whereby AEP seeks declarations that BofA has no security interest in natural gas stored in HPL's facilities, and (2) contract and tort claims for damages in which AEP claims that BofA fraudulently induced AEP to enter into the 2001 transaction.

The following is a description of the motions that have been made with respect to various counts in the complaint and various counterclaims in the answer.  There are ten counts in the complaint and seven counterclaims asserted by defendants.  A description of the allegations in the various counts and counterclaims will be deferred until later in the opinion, after a summary of the facts.

## The Motions and Prior Rulings

Seven motions have been made: (1) AEP's motion for partial summary judgment seeking to prevail on Counts II and VI of the complaint and seeking dismissal of all of defendants' counterclaims; (2) BofA's cross-motion for partial summary judgment dismissing Count VI of the complaint; (3) BofA's motion to refer AEP's motion for partial summary judgment to the Enron bankruptcy court; (4) BofA's motion for summary judgment seeking dismissal of all of AEP's claims and seeking relief on BofA's counterclaims II-IV; (5) AEP's motion to file a third amended complaint; (6) AEP's motion to correct the summary judgment record; and (7) AEP's motion to defer BofA's main motion for summary judgment pending additional discovery.

## Prior Rulings

On January 31 and February 1, 2007, and later on March 12, the court heard argument on the summary judgment motions.  On February 1, the court made several findings on the record.  The court held that BofA has a valid, presently-enforceable security interest in 55 billion cubic feet of gas that was

not subordinated in the 2001 transaction in any way.  The court also held that the Enron bankruptcy was a default under the relevant agreements.  The court further held that the settlement agreement between Enron and BofA that resolved BofA's claims in the bankruptcy court does not affect BofA's ability to enforce its security.  Finally, the court rejected AEP's theory that the 1997 transaction was a sham.   Under that theory, AEP argued that BofA has no security interest in the gas because BGT is not the true owner of the gas.

On February 22, after submissions from counsel, the court sent a memorandum to counsel applying its findings to specific counts and counterclaims in the summary judgment motions.  The court denied AEP's motion as to Counts II and VI, and granted BofA's motion with respect to Counts II through VI, dismissing these counts.  With respect to the counterclaims, the court denied AEP's motion as to the counterclaims, and granted BofA's motion as to Counterclaims II through IV.  The court also denied BofA's motion to refer AEP's partial motion for summary judgment to the bankruptcy court.  Those rulings are hereby confirmed.

Also in the February 22 memorandum, the court reserved decision on BofA's motion regarding Counts I and VII through X of the complaint.  As to the counterclaims, there were no motions remaining.  There was further argument on Counts VII through X on March 12 after which the court again reserved decision.

The present opinion deals with Counts I and VII through X of AEP's complaint.  Count I seeks a declaration that BofA's security interest in gas owned by BGT is limited to an interest in personal property storage gas. Counts VII through X allege causes of action for false contractual representation, common law fraud, fraud in a stock transaction (Texas statute), and negligent misrepresentation.  For the reasons stated below, the court grants BofA's motion on Counts I and VII through X, and the counts are dismissed.  Thus, the entire complaint is now dismissed.

The court denies the other three motions filed by AEP—motions for leave to file a third amended complaint, to correct the summary judgment record, and to defer summary judgment proceedings under Rule 56(f).

### Facts

On December 30, 1997, Enron entered into a complex special-purpose-entity ("SPE") transaction that was structured to qualify for "off-balance-sheet" accounting treatment.  The transaction is documented in a number of agreements collectively referred to as the "Operative Documents."  The Operative Documents include, inter alia, a Participation Agreement, a Security Agreement, a Pressurization Agreement, a Marketing Agreement, a Performance Guaranty, a Declaration of Trust, an Option Agreement, a Storage Gas Sale Agreement, and a Commodity Swap Agreement between BGT and BofA. Another relevant agreement, which is not part of the Operative Documents, is a Commodity Swap Agreement between BofA and Enron Capital and Trade

Resources Corp. ("ECT"), an Enron subsidiary.  The relevant details of the transaction are as follows.

BGT, the SPE in this transaction, was created by the Declaration of Trust, and BONY was made trustee.  BGT is owned in equal shares by BofA and Enron Finance Corp.  As part of the transaction, BGT bought 80 Bcf (billion cubic feet) of natural gas from HPL, which was then an Enron subsidiary.  The agreements refer to this gas as Storage Gas.  BGT paid $232 million for the gas.

HPL operates the Bammel Storage Facility (or Storage Reservoir), an underground storage reservoir for natural gas, and a gas pipeline associated with it.  The Storage Gas bought by BGT was a mix of 55 Bcf of "cushion gas" and 25 Bcf of "working gas" that was contained in the Bammel Storage Facility. Cushion gas is gas that is needed to pressurize the facility and that allows the facility to function.  Cushion gas cannot be withdrawn without destroying the facility.  Working gas is non-cushion gas that is stored in the Bammel Facility.

BGT obtained the money to purchase the gas from (1) a $218 million loan from Nations Bank, N.A., the predecessor-in-interest to BofA;[1] and (2) equity investments in BGT by BofA and Enron Finance Corp., each in the amount of $6.96 million.  Under the Security Agreement, BGT granted BofA a security interest in the purchased gas, as collateral for the loan.

---

[1] Hereafter, this opinion will not differentiate between Nations Bank and BofA, and will refer only to BofA.

-6-

Although BGT purchased the gas from HPL, BGT agreed to allow HPL to continue to use the gas according to the terms of the Pressurization Agreement. In return, HPL agreed to pay BGT "pressurization fees."  BGT used the pressurization fees received from HPL to pay the interest on the loan to BofA. Also under the Pressurization Agreement, beginning in February 2004, HPL was obligated to withdraw the gas and make it available to BGT according to the following schedule:

| Month | Volume (in Bcf) |
| --- | --- |
| February 2004 | 6.925374 |
| March 2004 | 7.402986 |
| April 2004 | 7.164180 |
| May 2004 | 7.402986 |
| June 2004 | 7.164180 |
| July 2004 | 7.402986 |
| August 2004 | 7.402986 |
| September 2004 | 7.164180 |
| October 2004 | 7.402986 |
| November 2004 | 7.164180 |
| December 2004 | 7.402986 |

Under the Marketing Agreement, ECT agreed to sell the gas that HPL made available throughout 2004 on behalf of BGT.  The proceeds from this sale would be used by BGT to pay back the principal of the loan to BofA.  Since the majority of the gas owned by BGT was cushion gas, which cannot be withdrawn without destroying the facility, HPL was authorized to make available, and ECT was authorized to sell, amounts of gas equivalent to the cushion gas, called "exchange gas."

HPL also received an option to purchase the gas, pursuant to the Option Agreement.

As part of the transaction, BGT entered into a commodity swap with BofA in order to hedge against the variable price of natural gas, its only asset. As the gas was to be sold off in 2004, BGT was to pay BofA the then-current (2004) price of gas and BofA was to pay to BGT the 1997 price. BofA then entered into a parallel commodity swap with ECT in order to hedge against BofA's risk. Under this swap, BofA was to pay ECT the 2004 price, and ECT was to pay BofA the 1997 price. AEP refers to this set of swaps as the back-to-back commodity swap. The agreement evidencing this latter commodity swap is the agreement that is not part of the Operative Documents.

Finally, Enron executed a Performance Guaranty in favor of BofA and BGT. Enron guaranteed the performance of all of HPL's and ECT's obligations under the Operative Documents.

The purpose of this 1997 transaction was to "monetize" the gas—Enron essentially converted the gas, a commodity, into cash—while keeping the liability for the loan off of Enron's consolidated balance sheet. That is, if this transaction qualified as an SPE transaction and qualified for off-balance-sheet treatment under the applicable accounting rules—a question which is part of the dispute in this case—then Enron could properly recognize the proceeds of the sale of the gas to BGT without having to report the debt to BofA on its financial statements.

Sometime in 2000, Enron decided to sell HPL.  For its own accounting advantage, Enron desired to leave the 1997 transaction in place and to provide a long-term lease of the Bammel pipeline and the Bammel Storage Facility, which HPL operates, to the eventual purchaser.  As it turned out, AEP was the purchaser in a complex transaction that closed at the end of May 2001.  The following is a description of what led to this transaction.

In July 2000, AEP expressed interest in purchasing HPL.  Dwayne Hart, AEP's Vice President for Business Development, had previously worked at Enron, was familiar with HPL, and knew that the storage gas was monetized. AEP desired to purchase HPL, the Storage Facility, the pipeline and the gas owned by BGT, but Enron refused.

In August 2000—after reviewing a memorandum from Enron's investment bankers—AEP submitted a non-binding bid for HPL.  In September, Enron created a data room for AEP to conduct due diligence.  AEP sent twenty-five people to the data room, including outside counsel and investment advisors.  By late November or early December, AEP was provided with the Operative Documents (see supra).  During the diligence, AEP requested to review audit work papers of Arthur Andersen relating to Enron.  Enron refused. The parties dispute whether AEP received the Commodity Swap Agreement between BofA and ECT.

After months of negotiating, AEP and Enron settled on a transaction with the following structure.  AEP bought HPL.  HPL bought 25 Bcf of working gas

back from BGT for $94 million (BofA later agreed to release its security interest in that amount of gas (see infra)).  That left BGT with title to 55 Bcf of cushion gas only.  HPL assigned its rights and obligations under the 1997 transaction to BAM Lease Co. ("LeaseCo"), an Enron subsidiary.  LeaseCo then leased the Bammel Storage Reservoir and its associated pipelines and facilities to HPL for thirty years (with an optional renewal term of twenty years).  AEP prepaid the rent for the entire thirty-year lease in the amount of $274 million.  Additionally, under a Right to Use Agreement, LeaseCo granted HPL "quiet enjoyment" of the cushion gas.  Quiet enjoyment is defined in the Right to Use Agreement as possession and use of the cushion gas free of adverse claims of third parties (§ 1.01).

Thus, LeaseCo was used as a vehicle for granting HPL (and AEP who was buying HPL) all of the rights that HPL had had under the 1997 transaction, while Enron continued to retain all of the obligations of HPL under that transaction (via LeaseCo).  That is, HPL continued to use and operate the Bammel Facilities and the cushion gas, but LeaseCo was now obligated to make the pressurization payments to BGT.  That way, the 1997 structure was kept in place and AEP received the Bammel Facilities in a transaction which was as close to a sale as was possible.  All told, AEP paid over $741 million.

All of the above was negotiated by December 27, 2000, when Enron and AEP signed a Purchase and Sale Agreement.  However, BofA, whose security would be affected, had not yet been brought in.  BofA was finally approached in

-10-

early 2001 and it eventually consented to the new arrangement.  In May 2001, the parties, including BofA, executed a number of agreements.  Several of the agreements were amended and restated versions of the 1997 transaction documents.  For example, the Security Agreement between BofA and BONY, the Performance Guaranty by Enron, and the Pressurization Agreement were all amended to substitute LeaseCo for HPL and to account for the reduction of BofA's security interest from 80 Bcf to 55 Bcf.  BofA agreed to release 25 Bcf from its security.  The increase in natural gas prices since 1997 ensured that with only 55 Bcf in 2001, BofA still had enough value in the security to cover the loan.  Though the Right to Use Agreement, mentioned above, was negotiated by the end of 2000, it was also only executed in May 2001.

Finally, BONY, HPL, Enron, and BofA executed a Consent and Acknowledgement (the "Cushion Gas Consent").  The central provision in the Cushion Gas Consent was that BofA consented to HPL's use of the cushion gas as provided in the Right to Use Agreement.  The Cushion Gas Consent also explicitly preserved BofA's security interest in the gas.  Cushion Gas Consent § 10 ("For avoidance of doubt, nothing herein shall impair the lien and security interest of BofA under the Security Agreement . . .").  It was AEP and Enron who drafted the Consent, and they presented it, fully drafted, to BofA for signing.  BofA changed a single word before signing it—it added the word "actual" before "knowledge" in section 2(e).

Section 2(e) is the centerpiece of AEP's misrepresentation and fraud

claims ("section 2(e) claims"), dealt with in this opinion.  It provides that,

> Each of BofA and the Trustee agrees and acknowledges
> that each Operative Agreement is in full force and effect
> and that, to its <u>actual</u> knowledge, no defaults by . . .
> [Enron] exist and no events or conditions exist which
> after the passage of time or the giving of notice or both
> would constitute a default or Event of Default by . . .
> [Enron] thereunder.

The parties have agreed on how to construe the phrase - "to its actual

knowledge, no defaults by Enron exist" - as follows.  The parties agree that

what is meant here is that, at the time of the closing of the 2001 transaction,

BofA did not possess any actual knowledge of Enron defaults.

Under section 5.01 of the Amended and Restated Performance Guaranty,

one of the Operative Documents, there exists a default if any representation

made by Enron under the Guaranty is incorrect in any material respect.  One

of the representations made by Enron under the Guaranty is that,

> The audited consolidated balance sheet of Enron and its
> Subsidiaries as of December 31, 2000, and the related
> audited consolidated statements of income, cash flows,
> and changes in stockholders' equity accounts for the
> fiscal year then ended and the unaudited consolidated
> balance sheet of Enron and its Subsidiaries as of March
> 31, 2001, and the related audited consolidated
> statements of income, cash flows, and changes in
> stockholders' equity accounts for the fiscal quarter then
> ended . . . fairly present, in conformity with GAAP . . .
> the consolidated financial position of Enron and its
> Subsidiaries.

(§ 3.01(d)(i)).

-12-

Under the Purchase Option Agreement, HPL received from LeaseCo the right to purchase the cushion gas if certain events of default occurred, including Enron's bankruptcy.  Additionally, under the Cushion Gas Consent, HPL received the right to have notice of Enron defaults and the subsequent right to cure those defaults so that it would not lose its right to use the gas.

As mentioned above, the 2001 transaction closed at the end of May 2001.  In December 2001, Enron and LeaseCo filed for bankruptcy in the Southern District of New York.  The bankruptcy and the failure of LeaseCo to make pressurization payments to BGT constituted defaults under the 2001 transaction.

### **Procedural History**

In July 2002, BofA filed a declaratory judgment action against HPL in Texas state court.  In October 2003, AEP filed a complaint in federal court in the Southern District of Texas.   That complaint contained the section 2(e) claims which are now in its complaint in this court as will be described.  In December 2003, the state court entered final judgment against HPL, declaring that (a) HPL is estopped to deny that BGT is the owner of the gas; (b) BofA holds a valid security interest in the gas as against HPL; (c) the bankruptcies of Enron and LeaseCo constitute events of default under the 2001 transaction documents; and (d) any rights of HPL under those documents are subject to BGT's ownership rights and BofA's security interest in the gas.  On January 8, 2004, AEP amended its complaint to include claims for declaratory judgment.

On January 15, 2004, the Enron bankruptcy court issued an order approving a settlement agreement among Enron, BofA and BONY.  The order lifted the automatic stay for the purpose of allowing BofA and BONY to attempt to realize upon the value of the cushion gas that belonged to BGT and was in AEP's possession.  Pursuant to that order, BofA sent notices of default and Settlement Notices, as provided for in the Amended and Restated Performance Guaranty, to Enron and LeaseCo, with copies to AEP.  Enron did not perform its obligations under the Amended Performance Guaranty in response to these letters, nor did AEP cure any of the defaults or exercise its option to purchase the gas.  Then, on May 14, 2004, BofA demanded that AEP withdraw, and transfer custody of, 55 Bcf of gas in the Bammel Facility to BofA.  AEP refused.

On April 6, 2005, the Southern District of Texas severed AEP's declaratory claims and transferred them to the Southern District of New York.  On May 13, 2005, after the transfer was complete, AEP moved in this court to amend its complaint to conform it to the transfer order.  Specifically, AEP sought to eliminate AEPGH as a plaintiff and to withdraw the section 2(e) claims.  BofA opposed the motion.  In a November 21, 2005 status conference, this court told the parties that, for reasons of judicial economy, the entire case should be tried in one place.  The court suggested that even though AEP sought to eliminate the section 2(e) claims from the case, BofA could file third party declaratory claims against AEPGH on the same issues in New York to effectively bring those claims before this court.  BofA accepted the court's

-14-

invitation and moved on December 12, 2005 to file a third party complaint. Recognizing that it could not avoid litigating the claims in this court, AEP consented to the denial of the part of its May 13 motion that related to the elimination of AEPGH and the section 2(e) claims, thereby agreeing to have them remain in the complaint.

On August 24, 2006, the Court of Appeals of Texas vacated the December 2003 Texas state court judgment holding that it was void as violative of the automatic stay in the Enron bankruptcy.  This development led to AEP's filing of its October 2006 motion for leave to amend the complaint in this court. Since the Texas state court's judgment is now void, AEP is no longer prevented from claiming that BGT is not the owner of the gas.  As a result, AEP seeks to amend the complaint to plead its "sham transaction" theory—i.e., that the 1997 transaction was a sham, BGT is not the true owner of the gas, and therefore, BofA has no security interest in the gas.  This theory was rejected by the court at the February 1, 2007 argument.

### The Complaint and Counterclaims

AEP's Second Amended and Supplemental Complaint, the operative complaint in this court, contains ten counts.  Counts I through VI are AEP's declaratory claims.

Count I seeks a declaratory judgment that BofA's security interest is limited to an interest in personal property storage gas sold to BGT in 1997 that remained in the Bammel Storage Reservoir as of May 31, 2001.  Count II seeks

a declaratory judgment that BofA and BONY may not foreclose upon, withdraw, or sell any gas contained in the Bammel Storage Reservoir.  Count III seeks a declaratory judgment that BofA and BONY released AEP from any and all obligations or liabilities associated with the 2001 transaction and thus may not interfere with AEP's right to use cushion gas or any other Bammel Storage asset.  Count IV seeks a declaratory judgment that BofA's and BONY's sole recourse for Enron's defaults in connection with the 1997 and 2001 transactions was against Enron.  Count V seeks a declaratory judgment that neither BofA nor BONY may interfere with HPL's rights under the Cushion Gas Consent or take any actions inconsistent with AEP's use of cushion gas in connection with the operation of the Bammel Storage Reservoir.  Count VI seeks a declaratory judgment that BofA and BONY have released and waived their rights under the 2001 transaction documents, and therefore may not foreclose upon, withdraw or sell any gas contained in the Bammel Storage Reservoir.

Counts VII through X contain AEP's section 2(e) claims.  Count VII alleges that BofA made a representation in section 2(e) of the Cushion Gas Consent that it knew of no defaults, and that this was false.  Count VIII alleges common law fraud.  Count IX alleges fraud in a stock transaction under Texas state law.  Count X alleges negligent misrepresentation.  The contract claim in Count VII and the fraud and misrepresentation claims in Counts VIII through X have solely to do with the alleged falsity of section 2(e).

BofA asserts seven counterclaims in this case.  Counterclaim I refers to the fact that AEP is disputing the validity of the 1997 transaction, asserting that HPL did not have marketable title to the Storage Gas, disputing the purchase of the Storage Gas, disputing the transfer of ownership of the Storage Gas, disputing that the trustee was deemed to have taken possession of the Storage Gas, and disputing that the Storage Gas constituted personal property. BofA asserts that to the extent AEP prevails on any of these claims, HPL has breached its obligations under a number of the 1997 and 2001 agreements. Counterclaim II alleges that by refusing to return the Storage Gas, HPL has breached a bailment agreement.  Counterclaims III and IV allege common law claims of conversion, trover, detinue, return of property and replevin based on HPL's refusal to relinquish possession of the Storage Gas.  Counterclaim V alleges that in the 1997 Storage Gas Sale Agreement and the 1997 Participation Agreement, HPL negligently misrepresented that (i) it had marketable title to the Storage Gas, (ii) it was transferring ownership of the Storage Gas to the trustee, and (iii) the trustee was deemed to have taken possession of the Storage Gas. Counterclaim VI alleges that AEP made fraudulent statements in the 2001 transaction.  Counterclaim VII alleges that to the extent BofA is required to make any payment to AEP as a result of this litigation, BofA is entitled to contribution from HPL for any misrepresentations HPL may have made to AEP during its purchase of HPL.

As described above, the court has already disposed of a number of these claims.  The court previously dismissed Counts II through VI of the complaint, and ruled in favor of BofA on Counterclaims II through IV.  This opinion deals with Counts I and VII through X of the complaint.  The remaining issues for the court to decide concern the character of the gas—i.e., whether the gas is real property or personal property—and the viability of AEP's section 2(e) claims.

**Discussion**

**Subject Matter Jurisdiction and AEP's Motion for Leave to File a Third Amended Complaint**

As a threshold matter, AEP argues that this court lacks subject matter jurisdiction over the section 2(e) claims.  AEP asserts this argument both in its motion for leave to file an amended complaint and in opposition to BofA's motion for summary judgment. AEP's proposed amendments to the complaint would do two things: (1) remove AEPGH and the section 2(e) claims from the complaint and (2) plead AEP's "sham transaction" theory, as described above.

 AEP first filed all of its claims in the Southern District of Texas.  Later, that court severed only AEP's declaratory claims and transferred them to the Southern District of New York.  AEP argues that since the section 2(e) claims were not part of the transfer order, this court lacks jurisdiction over those claims.

However, since AEP consented to the arrangement whereby the section 2(e) claims remained in this court, as described above, AEP waived its objection to this court's jurisdiction and cannot assert it now.

Additionally, since the court already rejected AEP's "sham transaction" theory at the February 1 argument, an amendment to the complaint to plead that theory would be futile.  Therefore, AEP's motion for leave to file a third amended complaint is denied.

## Summary Judgment

Summary judgment may be granted only upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether there is such an issue, the evidence is viewed in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all ambiguities in its favor.  Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006).  The moving party bears the initial burden of showing why it is entitled to summary judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Where the nonmovant bears the burden of proof at trial, the movant may either (1) point to evidence that negates the nonmovant's claims or (2) identify an evidentiary insufficiency in the nonmovant's evidence.  Having made such a showing, the burden shifts to the nonmovant to point to evidence creating a genuine issue of material fact.  Salahuddin, at 272-73 (2d Cir. 2006).

**Fraud Claims Arising from a Contract**

BofA suggests that summary judgment should be granted in its favor on AEP's tort claims for fraud where they arise from what is stated in a contract.  BofA argues that under Texas law, AEP may not assert fraud claims based on section 2(e), and that AEP is limited to pursuing a contract claim.  The court disagrees.

In Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998), the Supreme Court of Texas held that a plaintiff may recover in tort for fraudulent inducement irrespective of whether the misrepresentation is subsumed in a contract.  Based on Formosa Plastics, AEP may plead both a contract claim and fraud claims in connection with section 2(e).

**Estoppel v. Representation**

BofA argues that it is entitled to summary judgment on Counts VII through X because section 2(e), on which AEP bases those claims, is an estoppel provision as distinct from a representation.  Section 2(e) is entitled "Estoppel and Release."  However, under Texas law, "an instrument is that which its language shows it to be, without regard to what it is labeled."  Neece v. A. A. A. Realty Co., 322 S.W.2d 597, 600 (Tex. 1959).  As to the language of section 2(e), it provides, "BofA . . . agrees and acknowledges that each Operative Agreement is in full force and effect and that, to its actual

-20-

knowledge, no defaults by . . . [Enron] exist . . . ."  Thus, section 2(e) recites an agreement and an acknowledgment by BofA, and does not assert by its terms that it is a representation.  By way of contrast, section 7 of the same agreement, entitled, "Representations and Warranties of BofA," contains a number of representations by BofA under the preamble, "BofA hereby makes the following representations . . . ."  It is appropriate to give effect to the distinction between the statements made in section 7 that employ the language "representations" and the statement in section 2(e) that employs the language "agrees and acknowledges."

In general, a representation renders the party making a representation liable to another party who justifiably relies on the representation to its detriment, if the maker of the representation knew, or should have known, that the representation was false when made.  Section 2(e) is something other than a representation. "Agrees" indicates that there is another party involved in the assertion.  This is different from a representation.  An agreement indicates that both parties assent to the assertion.  Likewise, "acknowledges" indicates that a party was presented with an assertion by another party, and the first party assents to its truth.  The focus of "agrees and acknowledges," then, is not only on the speaking party as is the case with a representation, but rather the focus is on multiple parties.

The court holds that section 2(e) was an estoppel provision and not a representation.  An estoppel provision in the context of this case would mean

the following.  BofA would be estopped from declaring a default and taking possession of collateral on the basis of a default known to it at the time of the 2001 transaction.  Of course, no one suggests that BofA did any such thing.

The next section of this opinion will present a rather detailed description of facts relevant to the interpretation of section 2(e).

**Further Facts Regarding
Interpretation of Section 2(e)**

AEP alleges that the section 2(e) "representation" was false because there was, in fact, a default and AEP actually knew of it.  The default claimed by AEP is that Enron's accounting treatment for BGT was improper.  Indeed, sections 5.01 and 3.01(d)(i) of the Amended and Restated Performance Guaranty, quoted earlier in this opinion, had the effect of making improper accounting in Enron's financial statements a default.  And the impropriety alleged by AEP is that BGT was set up as an SPE for off-balance-sheet accounting treatment, but that there were defects in the structure of BGT, which meant that it did not qualify for such treatment.

AEP's accounting expert, Herbert Warner, identifies three criteria that were required to be met under the relevant GAAP at the time in order for an SPE to qualify for off-balance-sheet treatment.

First, the majority owner of the SPE must have been an independent third party who made an equity investment in the SPE.  Second, the independent third party's investment must have equaled at least three percent

-22-

of the fair value of the SPE's assets.  Third, the third party's equity investment must have been at risk.

Warner asserts that BGT did not meet these criteria because:

(1)  BGT was owned 50/50 by Enron and BofA, such that the trust had no majority owner, and hence no <u>independent</u> majority owner.

(2)  BofA was paid transaction structuring fees that under the applicable accounting rules are treated as a return on equity. Thus BofA's equity in BGT must be reduced by the amount of the structuring fees it received, pushing its equity below the three-percent threshold.

(3)  BofA's equity was not at risk because of a back-to-back commodity swap between Enron and BofA that eliminated BofA's risk in the transaction.

In dealing with these contentions of AEP, it is necessary to start by recognizing the obvious fact that there was no need for BofA to advise AEP of the fact that BGT was an SPE, and that its structure as such was the basis for off-balance-sheet accounting by Enron.  This was the <u>whole purpose</u> of the 1997 transaction, and the basic features of that transaction—involving BGT as an SPE and the accounting treatment—were carried forward in the 2001 transaction, with AEP's full knowledge and consent.  Douglas Penrod, an AEP vice president, testified that the 1997 transaction involved an SPE and that he

analyzed and understood why Enron structured the 1997 transaction the way it did (Dep. 74:3-16).

Regarding BGT's alleged defects, as testified to by Warner, AEP either knew of them or had ready access to them.  In his deposition, Warner conceded that all but one of the defects he identified—that BofA's equity was not at risk because of the back-to-back commodity swap—were ascertainable from the Operative Documents themselves.  And it is undisputed that AEP received and reviewed the Operative Documents.  Although AEP claims not to have received the BofA-ECT Commodity Swap Agreement, Penrod testified at his deposition that the swap was disclosed to AEP by Enron (Dep. 144:2-145:12).  Thus, the undisputed evidence shows that AEP knew all of the relevant facts and knew or could have ascertained every alleged defect in the design of BGT.

At this point, it is necessary to point out a very fundamental problem with AEP's position.  What AEP claims to have been the default involved the very transaction that AEP bought into in 2001.  AEP complains about the accounting treatment of BGT by Enron, and the alleged failure by BofA to disclose that this accounting treatment was improper.  But the accounting treatment of BGT, involving off-balance-sheet treatment of a liability, had an unusual significance in the transaction AEP entered into.  The purpose and character of the entire transaction, with its complicated mechanisms, was to provide for BGT as an SPE and to have the off-balance-sheet accounting. Without such an SPE and such accounting, none of the mechanisms which

-24-

AEP became a party to in 2001 would have even existed.  Therefore, what AEP is now claiming to have been a default was essentially <u>the transaction itself</u>. This amounts to saying that the transaction was a default in connection with the transaction.  This, of course, is an absurdity.

BGT and the accounting treatment may well have been problematic, as Warner has pointed out.  But AEP chose to do business with Enron and BGT and the other related entities <u>as they were</u>, with whatever virtues or vices were involved, and with whatever risks were presented.  AEP did so with its eyes open.  It had full information about ownership and structure of BGT and the accounting treatment.  If it lacked any information, it had a right to obtain it from Enron in the lengthy and elaborate negotiations and investigations.  If AEP was denied anything, it had a right to object or even withdraw from the transaction.  But there is no suggestion of AEP pursuing any objection about lack of information.

It was not up to BofA to tell AEP what kind of a business transaction to enter into.  BofA was not AEP's guardian.  Nor was it BofA's responsibility to pass an accounting judgment on the transaction by declaring there was a default because of improper accounting.  Any accounting judgment would have involved, first of all, the relevant facts, all of which AEP knew or had ready access to.  As far as any conclusion as to the accounting, AEP willingly and knowingly accepted the transaction <u>as it was</u> with the accounting treatment <u>as it was</u>.

In hindsight, AEP now claims that BofA should have declared the accounting treatment improper, and thus that there was a default.  The problem with this contention is that, for the reasons indicated above, this would have meant declaring the entire arrangement, starting in 1997 and carried forward in 2001, to be improper.  The accounting treatment was integral to the type of structure created, and without it there would have been no 1997 monetization and no 2001 transaction between AEP and Enron in the form it took.  AEP may regret that it entered into the transaction, but this was its own business decision.  The argument that BofA should have raised warning flags passes over any question about AEP's responsibility.  AEP was the party who actually contracted with Enron for the complex arrangements arrived at in 2001.  In other words, AEP helped to create these arrangements, and at the heart of such arrangements was BGT and the off-balance-sheet accounting.  AEP negotiated all this in the course of a lengthy investigation before BofA was brought into the picture.  If there were warning signs as to the structure of BGT and the accounting which should have caused a revision or a cancellation, then it is only realistic to say that AEP had some responsibility to heed them.  But AEP paid no attention whatever to any such subject.  This is shown by the deposition testimony of Dwayne Hart, AEP's Vice President of Business Development and lead negotiator for AEP in the 2001 transaction:

> Q.   Did you also review how Enron had accounted for the 1997 monetization transaction on its financial statements?

A.    No, sir.

Q.    Why not?

A.    Why would I care?

     . . .

Q.    Did you care to review how Enron accounted for the 1997 monetization transaction on its financial statements?

A.    No.

Q.    Did you care how Enron made the determination of how to account for the 1997 monetization transaction on its financial statements?

A.    No.

Q.    Why not?

A.    That was between them and their auditors.  We would care how we would account for this transaction.  We didn't care how they accounted for the sales contracts, the purchases contracts, the transportation contract.  We would bring all those over and deem what was proper accounting on our side.  It wasn't our job to audit how they were accounting.

(Dep. 372:12-373:16).

   It was, of course, the 1997 monetization, involving BGT and the off-balance-sheet accounting, which was carried over into AEP's 2001 transaction. In view of the attitude of AEP, as shown by Hart's testimony, there is no basis for holding that BofA should have come forward with an adverse accounting judgment.

-27-

It is crucial to observe at this point that, although BofA surely knew of the facts about BGT's structure and the off-balance-sheet accounting, there is no evidence that BofA had any greater degree of notice than AEP had that the accounting was improper.  In other words, it is certainly possible to argue that any party involved in these transactions should have known of possible problems but there is no evidence that BofA actually knew of a fatal flaw any more than AEP knew of such a flaw.  It should be noted that Joseph Bounaiuto, AEP's Chief Accounting Officer, admitted that issues about accounting treatment relevant to this case were in flux (Dep. 84:16-85:5).

The record shows that AEP did not rely in any way upon BofA for that kind of accounting judgment that AEP now claims BofA should have made.  AEP did not rely on banks for accounting, and AEP has provided no reason or evidence to suggest that the 2001 transaction presented an exception to that rule.

Geoffrey Chatas, AEP's Vice President of Finance, testified that he would never rely on bankers for questions of accounting:

> Q.   When you had questions of what the proper accounting treatment for any particular aspect of a transaction was, who would you go to to discuss that determination?
>                        . . .
>
> A.   Who where?
>
> Q.   Either internally at AEP first, or externally?

> A.   The first discussion was always, to my knowledge, with the controller on accounting issues.
>
> Q.   And thereafter who else would the discussions be with?
>
> A.   Again, the controller or with the outside auditor would be the two parties that we would have discussions on that accounting treatment.
>
> Q.   Anyone else?
>
> A.   Not that I recall.  Let me – as I think about it, the bankers would often have opinions. We didn't rely on them, but the bankers would often have opinions or make presentations as to their view of how accounting treatment should be or could be – what would happen in different financings, how things would be accounted for.
>
> Q.   Why didn't you rely on them?
>
> A.   They are not accountants.

(Dep. 40:16-41:19).  Similarly, Joseph Bounaiuto, AEP's Chief Accounting Officer, testified that he would not consult with bankers about accounting matters because that is not their area of expertise:

> Q.   And do you recall consulting the bankers or the bankers' lawyers about the proper accounting treatment for Project Steelhead?
>
> A.   I wouldn't have consulted with bankers or bankers' attorneys about the proper accounting.
>
> Q.   Why not?
>
> A.   That is not their area of expertise.

(Dep. 24:16-23).

Further, the evidence indicates that AEP never relied on BofA for the accuracy of Enron's accounting because no one at the time thought that section 2(e) was a representation about Enron's financial statements at all. AEP's own outside counsel, Michael Waller of LeBoeuf, Lamb, Greene & MacRae, testified that he could not recall any conversation whereby anyone viewed section 2(e) as a representation about Enron's financial condition:

> Q.   Did you ever have a discussion with anyone at Enron that you viewed section 2(e) . . . to include a representation by Bank of America concerning Enron's financial condition?
>
> A.   I don't recall any such conversation.
>                    . . .
>
> Q.   To your knowledge, did anyone from LeBoeuf, Lamb or from AE – or AEP communicate to Vinson & Elkins or Enron that AEP and LeBoeuf, Lamb were viewing section 2(e) as a representation by Bank of America concerning Enron's financial condition?
>                    . . .
>
> A.   I don't recall any such assertion.

(Dep.136:6-10, 139:11-17).

This is consistent with the testimony of Dwayne Hart, AEP's  lead negotiator for AEP in the 2001 transaction, about the genesis of section 2(e). Hart testified that section 2(e) was inserted because AEP was concerned about existing defaults.  When asked why he was concerned, he answered that, "We wanted to make sure that everything had been working the way they had told us it had been working" (Dep. 484:14-16).  When probed further about his

concern, Hart answered that AEP was concerned "because we were going to be making payments to Enron and wanted to know their history of paying the monetization and the issues of such" (Dep. 484:24-485:3).  That is, AEP wanted to make sure that there were no issues with how the structure set up in the 1997 transaction was being carried out.  Tellingly, throughout his discussion of section 2(e), Hart never identified Enron's financial condition as a default he was concerned about (Dep. 483:87).  Thus, the evidence suggests that no one at the time understood section 2(e) to be a representation about Enron's accounting.

It is appropriate to conclude that BofA had no duty to come forward in 2001 and declare to AEP that the structure of BGT and the off-balance-sheet accounting was erroneous, and thus a default in connection with the transaction.  Neither section 2(e) nor any other contractual provision gave BofA the slightest notice that it had such a duty.  AEP did not rely, and could not justifiably rely, upon BofA to apprise it of accounting problems with respect to BGT.  Nor can it be said that section 2(e)'s reference to default gave BofA the responsibility for determining the basic validity of the 2001 transaction.  It is in the context of all the circumstances described that the court holds that section 2(e) was an estoppel provision and not a representation.

**Reliance**

Even if section 2(e) should be interpreted as a representation, AEP cannot hold BofA liable because, by virtue of circumstances already described,

it is clear that there was no reliance.  The previous section of this opinion

discusses reliance as bearing on the interpretation of section 2(e), and that

discussion applies here with equal force.

      To prevail on a claim for fraud or negligent misrepresentation under

Texas law, a plaintiff must prove justifiable reliance on a fraudulent statement.

Ernst & Young, LLP. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001);

Federal Land Bank Ass'n v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991).

      AEP argues that reliance is not an element of a breach of contract claim,

and thus is not an element of its claim in Count VII.  BofA argues that the

normal rule requiring proof of reliance in fraud and misrepresentation claims

applies to Count VIII.  The court takes the position that if section 2(e) is to be

construed as a representation, which the court rules that it is not, then

reliance would be an element of a contractual claim under section 2(e) - i.e.,

Count VII in this case.

**Three Other Transactions**

      The discussion thus far has dealt with the special purpose entity BGT,

which was at the heart of both the 1997 and the 2001 transactions.  However,

AEP contends that there were three other special-purpose entities which were

improperly accounted for, and that this circumstance constituted a default

within the meaning of section 2(e).  These three transactions are known as

Brazos, Rawhide and Zephyrus.  AEP contends that BofA knew that these

entities were improperly structured and erroneously involved in off-balance-sheet accounting.

In the Brazos transaction BofA was a lender and Salt Fork Trust, a BofA entity, was an equity holder in the SPE.  In the Rawhide transaction, BofA was a lender.  In the Zephyrus transaction, BofA was a lender and the parties dispute whether BofA was also an equity holder in the SPE.

In the Brazos transaction, similar to the Bammel transaction, Warner, AEP's expert, now concludes that the three-percent equity requirement was not met because of structuring fees earned by BofA that reduced its capital investment.  Further, Warner concludes that the investment was not at risk because of an Enron guaranty and that the equity was not really equity but rather debt.

Regarding the Rawhide transaction, the equity investor in Rawhide was an entity known as LJM2.  Andrew Fastow, the then-CFO of Enron, was the general partner of LJM2.  Thus, Warner concludes that there was a lack of independence.  Additionally, Warner concludes that the equity investment was not at risk because the investors had the benefit of Enron guarantees that more than covered their risk.

Finally, with respect to the Zephyrus transaction, Warner concludes that the purported equity was in fact subordinated debt.  Therefore, there was no equity investment at all.

There is no evidence that AEP knew the facts about these transactions. However, AEP concedes that it generally knew that Enron "engaged in complex transactions and off-balance-sheet deals" (Mem. in Opp'n 57).  And Enron's financial statements showed that there were several billion dollars in off-balance-sheet debt without specifying the particulars.  Also, AEP understood that the accounting literature relevant to the SPE transaction was in flux (Bounaiuto Dep. 84:16-85:5).

AEP's case about these entities suffers from the same essential weakness as its case regarding BGT.  In 2001, when AEP was proposing to become involved in one SPE arrangement, it gave no thought whatever to the merits or demerits of the off-balance-sheet treatment of BGT, and there is similarly no indication that it gave any thought to the general problem of Enron's accounting treatment for SPEs.  To the extent that the issue deserved scrutiny, AEP surely had accounting expertise at its disposal.  And the evidence is conclusive that AEP relied on its accountants for accounting advice, and not on banks, including BofA.

The court concludes that BofA had no duty to give AEP accounting judgments regarding Enron's general off-balance-sheet practices.  This conclusion coincides with the earlier holding of the court that section 2(e) was an estoppel provision and not a representation.  Even if section 2(e) was a representation, the evidence is clear that AEP did not rely upon BofA for accounting questions.

-34-

**AEP's Discovery Request**

AEP moved under Fed. R. Civ. P. 56(f) to continue summary judgment proceedings in order to allow it to depose Andrew Fastow, and Mary Cilia, an Arthur Andersen auditor.  AEP submits that their testimony raises issues of material fact about BofA's knowledge.  Since the court finds that AEP cannot prove reliance, proof regarding BofA's knowledge would not alter the court's holding.  This renders Fastow's and Cilia's depositions immaterial, and AEP's motion is therefore denied.

**Character of the Gas**

Count I of the complaint alleges that under the 2001 transaction documents, to the extent there remains in the Bammel Storage Reservoir personal property natural gas that was sold to BGT in 1997 and that was contained in the Bammel Storage Reservoir as of May 31, 2001, BofA has at most a security interest in up to 55 Bcf of natural gas.  Correspondingly, Count I alleges that BofA does not have a security interest in any real property natural gas.  AEP would seek to prove in this litigation that the natural gas actually contained in the Bammel Reservoir in 1997, 2001, and today is real property natural gas, and thus, not subject to BofA's security interest.  BofA acknowledges that its security interest is limited to personal property natural gas, but maintains that all of the gas present in 1997, 2001, and today is personal property natural gas.

In 1997, when plaintiff HPL sold the gas to BGT, HPL represented to

BofA that the entire quantity of gas to be sold was HPL's personal property.
The 1997 Participation Agreement, § 5.01(m), stated that, "The entire quantity
of Natural Gas to be sold . . .  constitutes . . . personal property of the Sellers."
This representation is sufficient reason to grant summary judgment in favor of
BofA on this Count under the doctrine of estoppel by contract.  A party to a
contract may not take a position inconsistent with the contract's provisions to
the prejudice of another.  Coffey v. Singer Asset Fin. Co., L.L.C., No. 05-05-
01240-CV, 2007 Tex. App. LEXIS 692, at *27 (Tex. App., Jan. 31, 2007).  As a
result HPL and AEP are barred from introducing any evidence that conflicts
with the representation in § 5.01(m).

But even if AEP and HPL were not so barred, summary judgment in favor
of BofA would still be appropriate.  From March 1996 to February 2003, HPL
filed monthly G-3 Forms with the Texas Railroad Commission, where it
reported that there was no native gas present in the Bammel Reservoir.  Native
gas is natural gas which has not previously been withdrawn from the earth,
and under Texas law, native gas is real property.  Tex. Nat. Res. Code §
91.173(4) (2006); Trutec Oil & Gas, Inc. v. W. Atlas Int'l, Inc., 194 S.W.3d 580,
583 (Tex. App. 2006).   The evidence shows, then, that HPL itself considered
the gas in the Bammel Reservoir to be personal property gas.

In an attempt to explain away this evidence, AEP characterizes those
monthly reports as "a native-gas proxy for severance tax accounting purposes"
(Opp. Brief at 29).  In other words, according to AEP, its representations about

the lack of native gas starting in 1996 were a fiction used for tax purposes. The State of Texas taxes the production of native gas, but not gas storage.  Tex. Tax Code §§ 201.051, 201.053.  In 1966, the Bammel Field was converted into the Bammel Storage Reservoir.  At that time, according to AEP, the Reservoir held approximately 49.5 Bcf of native gas.  From 1966 until today, personal property gas has from time to time been injected into the Reservoir and has mixed with the native gas.  Gas has from time to time been withdrawn.  When the gas is withdrawn it is a mix of injected, non-native, personal-property gas and native, real-property gas.

HPL had to figure out how to properly pay taxes on the withdrawals of gas from the Reservoir.  In 1971, HPL agreed with the Texas Comptroller of Public Accounts that 7.5% of gas withdrawn at each withdrawal would be considered native gas on which tax would have to be paid.  The tax would be paid until the tax liability for the entire volume of native gas was satisfied. That is, the tax would have to be paid on 7.5% of gas at each withdrawal until such time as tax had been paid on the entire 49.5 Bcf of gas over the years. Indeed, HPL paid the tax through February 2002, at which point it came to its attention that the tax had been fully paid on the total 49.5 Bcf of native gas by the end of 1995.  As a result, HPL sought and received a refund from the State of Texas for taxes paid after 1995.

AEP has submitted the G-3 Forms that HPL filed with the Texas Railroad Commission for September and October of 2006, which report 49.5 Bcf of

native gas presently in the Facility.  These two filings were not part of the evidence that AEP submitted during briefing of the motion for summary judgment.  Instead, on March 8, 2007, AEP moved for leave to correct the summary judgment record by submitting these two documents.  AEP avers that they were inadvertently omitted from the earlier submissions.  BofA opposes the motion because these two documents were first created several weeks after BofA filed its motion for summary judgment and were therefore never produced to BofA, nor could BofA have questioned any witnesses about them.

These two recent filings contradict the dozens of filings made by HPL over a number of years.  The court grants AEP's motion to supplement the record and will receive the filings as evidence, but for obvious reasons gives them no weight.

AEP has additionally submitted the Preliminary Expert Report of its gas expert, Jamie Nielson, and the Analysis of the Bammel Gas Storage Field by Stephen Holditch, a petroleum engineering consultant.  Both essentially conclude that there still exist 49.5 Bcf of native gas in the Bammel Facility. Both come to this conclusion for the same basic reason.  According to both, the Reservoir held 49.5 Bcf of native gas in 1966, and withdrawals from the Bammel Facility have never exceeded the volumes injected.  But this ignores the fact that the injected non-native gas mixed indistinguishably with the native gas molecules.

AEP raises several other arguments in an attempt to create an issue of fact regarding the value of the gas at the Facility and the expense that would be incurred in connection with withdrawing the gas should it need to be physically transferred to BofA.  Such arguments are not germane to the issues presented by BofA's motion and thus do not raise genuine issues of material fact for summary judgment purposes.

According to the State of Texas, BofA, and AEP itself (from March 1996 through August 2006), there was zero native gas present in Bammel in 1997, 2001 and as of when AEP filed suit.  Accordingly, the court finds that the gas in the facility is indisputably personal property gas and grants summary judgment on Count I in favor of BofA.

## Conclusion

When all the complexities of these transactions are sorted out in light of the various detailed arguments of the parties, two basic conclusions emerge. BofA dealt with Enron and its related entities on a secured basis.  AEP dealt with Enron and its related entities on a non-secured basis and thus took the risks that were unfortunately involved with that dealing.  This litigation has been concerned with the effort of AEP to remove BofA from its secured position. However, BofA has done nothing, by contract or otherwise, to relinquish that position.

The court now grants summary judgment dismissing Counts I and VII through X.  This ruling, together with the prior rulings, means that the entire

-39-

complaint is dismissed.  Although the court has explicitly dealt only with

Counterclaims II through IV by way of BofA's motion, it inevitably follows from

the dismissal of the complaint that the rest of the counterclaims are dismissed.

The motion of AEP for further discovery is denied.

SO ORDERED.

Dated:       New York, New York
             August 28, 2007

_____
                    THOMAS P. GRIESA
                    U.S.D.J.