UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
                                          :
                                          :
                                          :
AEP ENERGY SERVICES GAS HOLDING           :
COMPANY, *et al.*,                        :      05 Civ. 4248 (TPG)
                                          :
              Plaintiffs,                 :      **OPINION**
                                          :
         - against -                      :
                                          :
                                          :   ┌──────────────────────────┐
                                          :   │ USDC SDNY                │
BANK OF AMERICA, N.A., *et ano.*,         :   │ DOCUMENT                 │
                                          :   │ ELECTRONICALLY FILED     │
              Defendants.                 :   │ DOC #: _____ │
                                          :   │ DATE FILED: /2//8/07     │
                                          :   └──────────────────────────┘

------------------------------------------x

Plaintiffs in this action are AEP Energy Services Gas Holding

Company, Houston Pipe Line Company LP, and HPL Resources Company

LP. All plaintiffs will be referred to collectively as AEP. Defendants are

Bank of America (BofA) and Bank of New York (BONY).

On August 27, 2007, this court dismissed AEP's complaint in its

entirety, and granted summary judgment to BofA on three of its

counterclaims. It followed from the dismissal of the complaint that the

rest of BofA's counterclaims were dismissed. The court held that BofA

dealt with Enron on a secured basis throughout the course of the

transactions, and as a result had a right to recover its security interest.

BofA's security interest consisted of 55 billion cubic feet (Bcf) of natural

gas located in the Bammel facility, which was owned by AEP. The court

also held that AEP converted the gas by refusing to turn it over to BofA when BofA requested it on May 14, 2004.

The present opinion serves to supplement the August 27 opinion by determining the form and amount of judgment that BofA is entitled to. For the reasons detailed in the memorandum below, the court holds that BofA has a right to elect between return of the gas and money damages equal to the market value of the gas on the date of conversion. Because BofA has elected money damages, the court holds that BofA is entitled to $347,325,000 – the Houston Shipping Channel ("HSC") market value of the natural gas on the date of conversion.

Finally, BofA's recovery must be reduced to account for the costs BofA would have incurred had it had to remove the natural gas from the Bammel storage facility. However, the fact that the gas is "cushion gas" does <u>not</u> merit reduction based on potential removal expenses particular to that type of gas. Rather, the award must be reduced by the costs necessary for removal of <u>any</u> 55 Bcf of natural gas from the facility.

<u>Procedural History/Facts</u>

The August 27 opinion includes a detailed description of the procedural history and facts of the case. Any facts necessary for resolution of the damages issue will be included in the course of the discussion below.

## Discussion

### Entry of Partial Final Judgment under Rule 54(b)

AEP contends that because the court has dismissed all of AEP's declaratory claims, the court should enter a partial final judgment under Fed. R. Civ. P. 54(b) in order to allow AEP to immediately file an appeal. AEP argues that its dismissed declaratory claims are separate and apart from BofA's counterclaims, which "involve a set of complex damages issues." AEP claims that because a trial is necessary to determine the damages award, and because the court's legal holdings could potentially be reversed, it would be inefficient to conduct a damages trial before allowing the appeal.

In order to enter a partial judgment, the court must make an "express determination that there is no just reason for delay." Fed. R. Civ. P. 54(b). Because all remaining issues can be resolved at this time and no damages trial is necessary, a partial judgment is not warranted.

### Form of Judgment

With regard to damages, the first issue to be determined is whether BofA is entitled to an award of money damages or is only entitled to a return of the gas itself.

At the conclusion of a hearing before this court on February 1, 2007, the court made several findings on the record. In a February 22 memorandum to counsel, the court applied these findings to specific claims and counterclaims made by AEP and BofA. Among other things,

the court found that HPL breached a bailment agreement with BofA, and granted BofA's common law claims of conversion, trover, detinue, return of property, and replevin based on HPL's refusal to relinquish possession of the gas. These findings were reiterated in the August 27 opinion.

In Texas, the state where the conversion took place, a party that establishes conversion is entitled to elect between i) a return of the property and damages for loss of use during the detention or ii) the value of the property. See, e.g., A.N.A. Prince Corp. v. Herolz, 1995 Tex. App. LEXIS 1843, at *11-12 (Tex. App. 1995). If the defendant chooses to recover damages, the measure of damages is the fair market value of the property at the time and place of the conversion, plus legal interest. United Mobile Networks, L.P. v. Deaton, 939 S.W.2d 146, 148 (Tex. 1997).

To clarify, the law is as follows. If on May 14, 2004 BofA had demanded return of the gas and AEP had complied, BofA would have only had a right to recover the gas. BofA could not have chosen to receive money damages from AEP instead of a return of the gas. However, because AEP refused to turn over the gas, and because this court held that AEP converted the gas when it did not relinquish it on May 14, 2004, BofA now has the right to choose between return of the gas or the market value of the gas on the date of the conversion, plus legal interest. BofA has elected to recover money damages rather than the gas itself.

## Valuation of the Gas

Because BofA has elected money damages, the court must determine how to properly value the gas. The parties are in dispute about the date to be looked to for determination of the market value, as well as whether the fact that the security interest was in "cushion gas" affects its market value.

### Appropriate date for determination of market value

With regard to the appropriate date for determination of the market value of the gas, BofA alleges that the date that should be used is December 14, 2005, when the market value of natural gas reached a high of $13.575 per MMBtu. In support of this argument, BofA cites Texas precedent that "if the conversion is attended with fraud, a willful wrong, or gross negligence, and the property converted is of changing or fluctuating value, the measure of damages is the highest market value of such property between the date of conversion and the filing of the suit." Imperial Sugar Co., Inc. v. Torrans, 604 S.W.2d. 73, 74 (Tex. 1980).

However, if none of these conditions are present, as stated earlier, the market value should be determined as of the date of the conversion. Because it was not unreasonable for AEP to initiate litigation based on a claim of superior right instead of immediately turning over the gas, the conversion was not a willful wrong, fraud, or gross negligence. Thus, the gas's value should be determined according to its market value on the date of the conversion – May 14, 2004.

## Effect of the type of gas on its market value

The next issue is whether the fact that the security interest was in gas specifically used as "cushion gas" affects its market value.

AEP claims that because the security interest was in "cushion gas," the market value of the gas is not the same as that of "working gas." Cushion gas is the amount of gas that is necessary to pressurize a facility. This amount of gas must necessarily remain at the bottom of a facility or else the facility may be destroyed. "Working gas" is any gas in the facility above and beyond the amount of cushion gas. AEP alleges that because cushion gas is the facility's bottommost gas and is often contained within porous rock, the process of removing this gas from the facility would cost millions of dollars, reducing its market value drastically.

In effect, AEP argues that in order to remove the cushion gas to return it to BofA, all of the working gas above the cushion gas must first be removed. Next, the cushion gas must be taken out, which in the process could ruin the facility. Finally, the working gas must be placed back into the facility. Further, AEP states that Texas regulations require certain regulatory steps to be taken before cushion gas is allowed to be removed from a facility. AEP claims that because these facts clearly affect the market value of the gas and make it harder to determine, a trial must be held to establish the gas's proper value.

In support of the argument that the security interest was in cushion gas, AEP cites BofA documents from 1997 in which BofA refers to the security interest as cushion gas. AEP alleges that these documents demonstrate that BofA understood that the interest was in gas that was to be used specifically to pressurize the facility.

BofA, on the other hand, alleges that "gas is gas" and contends that the value of the 55 Bcf of gas should be determined in the same manner as for any other gas. It is not disputed by AEP that a molecule of cushion gas is exactly the same as a molecule of working gas. BofA asserts that "cushion gas" does not connote a type of gas but rather a quantity of gas – the amount needed to pressurize a facility. BofA points out that even the Right to Use Agreement negotiated between LeaseCo and HPL in 2000 defined cushion gas as a quantity of gas, referring to it as "the quantity of Natural Gas in the Storage Facility that is necessary to maintain sufficient underground pressure in the Storage Facility."

BofA also states that in the original security agreement the security interest was defined as "up to 54,999,965 MMBtus of Storage Gas present in the Bammel Storage Facility in Houston, Texas from time to time," and that the 1997 transaction agreements did not reference the term "cushion gas." BofA alleges that the Cushion Gas Consent, signed years later, is the only agreement to which BofA was a party in which the term "cushion gas" was used. This agreement stated that in the absence of a default, HPL would be allowed use the gas as cushion gas.

In this contract, BofA conditioned its consent upon inclusion of the statement that "such related agreements do not increase the obligations or reduce the rights of . . . BofA under the operative agreements." The agreement further stated that "for avoidance of doubt, nothing herein shall impair the lien and security interest of BofA under the Security Agreement or, except as expressly set forth in section 2 hereof, reduce the rights and remedies of BofA under the Security Agreement." Thus, BofA claims that this language negates any possible argument that the Cushion Gas Consent reduced BofA's interest to be specifically in a type of gas worth less than market value.

Next, BofA states that under the 1997 agreement, the gas – despite its use as cushion gas – was to be valued according to the Houston Shipping Channel market rate. The purpose of the 1997 agreement was to monetize the gas at issue, and the plan for repayment of the loan was for this quantity of gas to be withdrawn from the facility in installments and sold at the HSC market rate. The agreement also stated that in lieu of withdrawing the gas, HPL could deliver "exchange gas" by purchasing it on the market. BofA claims that these provisions further demonstrate that the storage gas in the facility was understood to have the same value as any other gas sold on the market.

BofA emphasizes that if the agreement was ever meant to encompass an arduous and expensive process for recovering the security interest, as AEP suggests, the record would be replete with references to

it. Further, it is undisputed that there is 128 Bcf of gas in the facility, so removing 55 Bcf of gas will not in actuality create any pressurization problems. If 55 Bcf of natural gas were withdrawn in the normal fashion, there would still be a sufficient quantity of gas to pressurize the facility.

Finally, BofA points to a February 3, 2004 internal AEP email which clearly articulates an understanding that BofA's security interest was to be valued using the market rate applicable to working gas. The email stated:

> The portion of pad gas for which BofA holds a security interest would belong to HPL if we paid BofA. BofA's security interest is approximately $250 million on 55Bcf. *Using the current market value of $5.50,* this would equate to a total market value of $302M.

In light of the strength of BofA's above arguments, the court holds that the agreements clearly demonstrate that the security interest gas was intended to be valued at market rate. While the gas may have been used as cushion gas, based on the fact that the arrangement was structured to contemplate withdrawing the gas and selling it at market rate, there is no reason to assume that it should be valued at anything less than this market rate simply because there was a default and the scheduled withdrawals never took place.

The Houston Shipping Channel index prices are published in reliable industry reports, and the court can take judicial notice of them. Additionally, AEP does not dispute that the HSC price listed is an accurate reflection of the market price of natural gas on that date. The HSC index lists the market price for natural gas on May 14, 2004 – the

date of conversion – as $6.315. Thus, multiplying $6.315 by 55 Bcf (or 54,999,965 MMBtus to be precise), this amounts to a total market value of $347,325,000.

## Potential Reductions to the Judgment

### Reduction based on the cost of withdrawing the gas

As discussed above, the market value of the gas should not be reduced because it is being used as cushion gas. However, BofA's award should be reduced by the amount it would have cost BofA to remove the 55 Bcf of gas from the facility.

In 1997, it was agreed that Enron, not HPL, would be responsible for removal and delivery of the gas should BofA need to recover its security interest. This responsibility was later transferred to an Enron subsidiary. Thus, it is clear that AEP is not, and at no point was, responsible for withdrawal of the security interest gas under any contractual agreement. BofA does not seem to dispute this, but alleges that costs associated with withdrawal are irrelevant because BofA has elected to recover money damages.

Conversely, AEP claims that under Texas law, the award must be reduced by the amount it would have cost BofA to have the gas removed had the conversion not taken place. In support of this argument, AEP cites Neely v. Jacobs, 673 S.W.2d 705 (Tex. App. 1984), in which the court held that a damages award for conversion based on the wrongful retention of trade fixtures should be reduced by the amount it would

have cost the rightful owner to remove the fixtures had the conversion not occurred.

The court holds that the judgment must be reduced to account for this expense. Neither party has presented evidence to demonstrate how much it would cost to withdraw 55 Bcf of regular, market-value gas from the Bammel facility. BofA contends that removal of natural gas from a facility is a simple process that takes place all the time, so would be "virtually cost-free." Even if this is true, before a final damages figure can be reached, these costs – however small – must be calculated and subtracted from the judgment.

As gas is likely withdrawn from facilities near the Houston Shipping Channel fairly regularly and has likely been withdrawn from the Bammel facility in the past, reaching an estimate of the cost of such a removal should not be difficult. If necessary, a short hearing on this matter can be held to determine an appropriate reduction.

Reduction based on the amount of the outstanding loan

Arguing for a further reduction to the damages award, AEP alleges that BofA has a security interest in the gas only to the extent required to cover the loan. AEP bases this argument on the wording of the court's finding in its February 22 memorandum. The court stated that BofA's claim for conversion was granted "to the extent that the court has found that BofA has a valid and enforceable security interest in the Storage Gas." However, if this language created any ambiguity, the court

clarified in its August 28, 2007 opinion that BofA has "a valid, presently enforceable security interest in 55 billion cubic feet of gas." Because AEP was found to have converted all 55 Bcf of gas, it must pay money damages for the entire market value of the gas.

AEP does not cite to any precedent suggesting that the amount of the loan should be taken into account when determining a proper judgment for conversion. Had AEP been the borrower on the loan, this argument might have had merit, as often when a security interest is claimed because of a default, the creditor can only recover the security interest up to the amount required to cover the loan. However, AEP is not the borrower – the Bammel Gas Trust is – and this case is not about BofA's recovery of the value of the loan. The action was commenced to determine who has greater rights with regard to the gas, and damages are to be awarded to BofA based on the value of the converted property, not based on the amount due on the loan.

### Reduction based on BofA's failure to mitigate

AEP also contends that BofA had a duty to mitigate damages and failed to do so on two occasions. The first occasion was when BofA released 25 Bcf of the security interest gas so that Enron could sell this gas to AEP. AEP alleges that BofA is at fault for not ensuring that the $94 million that AEP paid Enron was given to the Bammel Gas Trust to partially repay the loan. Again, AEP cites no precedent demonstrating that BofA was required to do this. As stated at the September 2007

hearing, lenders have a right to release security if the value of the security interest has risen, and have no obligation to control whether any proceeds gained by the released security are used to repay the loan.

AEP also contends that BofA failed to mitigate damages when it stopped pursuing its Enron bankruptcy claims and instead entered a settlement agreement with Enron. AEP argues that BofA might have recovered some portion of the loan had it continued to pursue these claims. However, the court has already determined that BofA should be able to recover the security interest despite having settled with Enron. As stated above, the judgment to be awarded to BofA is based on a determination that AEP converted the security interest gas when it did not return it to BofA. Once this determination has been made, recovery should not hinge on the amount still due on the loan.

## Conclusion

For the above reasons, BofA is awarded damages of $347,325,000 plus prejudgment interest, less the costs – to be determined – of withdrawing the gas.

Dated: New York, New York
      December 18, 2007

SO ORDERED

Thomas P. Griesa
U.S.D.J.